**Affirmed and Memorandum Opinion filed May 9, 2019.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-01114-CV

---

## IN THE INTEREST OF G.C., A CHILD

---

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2017-03667J**

---

## MEMORANDUM OPINION

Appellant J.C. ("Father") appeals the trial court's final decree terminating his parental rights and appointing the Department of Family and Protective Services as sole managing conservator of his child G.C. ("Gloria").[1] The trial court terminated Father's parental rights on predicate grounds of endangerment and failure to complete a family service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E) and (O). The trial court further found that termination of Father's rights was in the

---

[1] "Gloria" is a pseudonym. Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minor and other individuals involved in this case.

child's best interest.  On appeal, Father challenges the legal and factual sufficiency of the evidence to support the trial court's findings on the predicate grounds and that termination was in Gloria's best interest.  Father further challenges the appointment of the Department as Gloria's managing conservator.  Because we conclude the evidence is legally and factually sufficient to support the trial court's findings, we affirm the decree of termination.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Pretrial Proceedings

#### 1.  *The initial referral and investigation*

Gloria was born very prematurely on January 30, 2017, at 22.6 weeks' gestation, and weighed only one and one-half pounds.  At Gloria's birth, the Department received a referral, which alleged that Gloria's mother S.J.J. ("Mother") frequently used methamphetamine while pregnant with Gloria.  Mother tested positive for methamphetamine at Gloria's birth.  Doctors placed Gloria in the neonatal intensive care unit, where Gloria's survival required her use of a breathing tube.

During the Department's investigation, Mother admitted using "crystal meth for as long as [she] could remember."  Mother disclosed that she had been unsuccessful in prior attempts at substance-abuse treatment.  Mother denied knowledge of her pregnancy until she was admitted to the hospital and gave birth.  Previously, Mother's parental rights to another child had been terminated, and the decree in the prior case included a finding of endangerment.

The Department's investigation confirmed that Gloria's urine test was negative for drugs at birth.  Both parents reported they were living in "campers" on Mother's sister's property.  Father admitted to the investigator that he had used methamphetamine "off and on," but as of Gloria's birth, Father had stopped using

2

methamphetamine and stated he would "try" not to use drugs going forward, claiming that "it's not a habit." Both parents tested positive for methamphetamine in hair-follicle and urine analyses.

Three months after Gloria's birth, Father tested positive for methamphetamine and amphetamine in a hair-follicle test, but Father's urine test was negative for those drugs. While Gloria remained in the hospital, Department efforts to contact Mother were unsuccessful. The hospital was unable to obtain consent for Gloria's necessary medical treatment because it could not locate either parent. The investigator noted that although Father "appeared to be in the picture and somewhat cooperative," he had recently tested positive for methamphetamine and his paternity had not been established.

2.      *Father's criminal history*

Father's criminal history dated back to 1990 and is listed in the removal affidavit as follows:

| Offense | Date | Disposition |
|---|---|---|
| Criminal mischief | 9/24/1990 | 2 years' confinement |
| Possession of marijuana | 12/11/2004 | 30 days' confinement |
| Failure to identify giving false information | 12/27/2005 | 30 days' confinement |
| Evading arrest or detention with a vehicle with a previous conviction | 3/10/2006 | 90 days' confinement |
| Driving while intoxicated | 4/2/2006 | 60 days' confinement |
| Possession of marijuana | 1/3/2007 | 20 days' confinement |
| Driving while license invalid | 5/5/2008 | 30 days' confinement |
| Assault causing bodily injury to a family member | 6/30/2008 | 60 days' confinement |

3

| Offense | Date | Disposition |
|---|---|---|
| Deadly conduct | 2/15/10 | 5 days' confinement |

3. *Family service plan*

Father's family service plan noted the reasons for Gloria's removal, and stated that the Department's goal was that Gloria grow up in a home free of abuse and "full of love, nurturing, safety, acceptance and protection." The plan noted that Father appeared to lack knowledge of Gloria's medical condition and its severity. Gloria required special nutrition care, including a feeding tube. Father had supported Gloria's basic needs while she was in the hospital but also tested positive for methamphetamine after her birth. The plan listed behavioral changes required of Father to reduce risk to Gloria. The plan required Father to:

- Understand the serious nature of the situation that placed the child in harm's way;
- Learn and demonstrate an understanding and be able to provide for the special needs of the child through counseling/therapeutic services;
- Demonstrate the ability to protect the child from future abuse or neglect and show concern for the future safety of the child;
- Demonstrate an ability to change his habits of drug use that resulted in abuse or neglect; and
- Maintain a safe and stable home environment that involves no family violence.

The plan then included tasks for Father to complete, including:

- Visitation with Gloria;
- Participate in parenting classes;
- Maintain legal employment;
- Complete a substance abuse assessment and follow all

4

recommendations;

- Complete a psychosocial assessment and follow all recommendations;

- Submit to random urine analysis requiring negative results and noting that a failure to submit to random analysis will be considered a positive result;

- Sign a release of information in which all services are performed so results can be sent to the caseworker;

- Maintain housing that is stable for more than six months;

- Contact the caseworker within 24 hours of moving and provide caseworker with an address and working phone number; and

- Attend all court hearings, permanency conference meetings and family visits.

The permanency report filed shortly before trial reflected that Father was compliant with most of the services required by the service plan. With regard to random drug testing, however, Father's hair-follicle tests were consistently positive for methamphetamine; and his urine tests were consistently negative. Father failed to appear for a urine test approximately four months before trial; when Father did not appear, that test was recorded as positive.

Following a substance abuse assessment, it was recommended that Father attend ten sessions on a relapse prevention track. One month before trial Father was "negatively discharged" from relapse prevention program because he continued to be opposed to treatment. Father was not allowed to return to treatment at that facility due to his verbal aggressiveness with the facility's staff. Father failed to comply with recommendations that he attend a supportive outpatient program.

The Department filed an amended service plan that included the same goal requirements as the original service plan but added the requirement that Father attend Narcotics Anonymous meetings and engage a sponsor to aid in his sobriety. The

trial court made the amended service plan an order of the court.

## B. Trial

Tonya Rogers, the Department caseworker, testified that Gloria came into the Department's care because she was born very prematurely to a mother who tested positive for methamphetamine when she gave birth. While Gloria was in the hospital she needed several medical procedures. Mother disappeared from the hospital and the hospital was unable to obtain consent for the medically necessary procedures. The Department was unable to place Gloria with Father because he also tested positive for methamphetamine.

Father obtained stable employment and housing. Father visited Gloria and brought her toys, presents, clothes, and shoes. Father completed most of his service plan but failed to obtain a psychological evaluation and a Narcotics Anonymous sponsor. Father also failed to attend Narcotics Anonymous meetings and was discharged unsuccessfully from a relapse prevention program. Rogers testified that the unsuccessful discharge was due to Father's aggressive behavior.

Rogers testified that Father consistently tested positive for methamphetamine in his hair, but his urine tests were negative. Father's first positive drug test was in February 2017, shortly after Gloria was born. At that time, the measure of methamphetamine in Father's hair follicle was over 200,000 picograms. Two months later Father again tested positive for methamphetamine in his hair follicle, but the measurement had decreased to 5359 picograms. One month later, in May, the methamphetamine in Father's hair decreased to 4617 picograms. Two months later, in July, the measure of methamphetamine was approximately the same, at 4623 picograms. In October 2017, the measure of methamphetamine in Father's hair increased to 13,136 picograms, indicating an increase in Father's use of methamphetamine. By January 2018, the measurement had decreased again to 4803

6

picograms. In February 2018, Father's hair and urine tests were negative for methamphetamine. In April 2018, he again tested positive with a measurement of 2242 picograms. The measure of methamphetamine in Father's hair went down at the beginning of the case but went up while the case was pending, indicating a relapse. From February 2017 through April 2018, Father consistently tested positive for methamphetamine in his hair follicle with the exception of the February 2018 negative test. Rogers testified that Father's drug tests reflected continuous use of methamphetamine through the pendency of the case.

Father showed no awareness as to how his drug use affected his ability to be a parent. Father did not understand Gloria's medical needs and Department determined it would be dangerous for Gloria to be returned to him. Gloria's long-term prognosis is positive if her special medical needs are met.

Rogers further testified to Father's multiple criminal convictions, some for violent offenses including assault of a family member and deadly conduct. Rogers testified that Father's criminal history demonstrated that he presented a continuing danger to Gloria.

Since Gloria's release from the hospital she lived in a foster home where she was doing well and "progressing tremendously." Gloria was born with special needs requiring extensive medical appointments. Gloria had ongoing occupational, physical, and speech therapy. She was still primarily being fed through a feeding tube known as a G-tube but otherwise appeared healthy and happy. The foster parents, with whom Gloria has lived since she left the hospital, want to adopt Gloria. Rogers testified that Mother's methamphetamine use contributed to Gloria's premature birth. The foster parents were meeting all of Gloria's needs, including making appropriate regular medical and therapy appointments.

Rogers acknowledged that she observed a bruise on Gloria while Gloria was

with the foster parents. The foster parent reported that Gloria hit her face with a toy. Gloria also had vomited while in the foster parents' care due to being fed too much through the G-tube. The foster parents corrected the feeding routine after this incident.

Courtney Tuki, the Child Advocate, testified that Gloria is "very bonded" with her foster parents. When one of them walks into a room, Gloria's "face lights up." Gloria is also interacting well with other children in the home.

Tuki also observed visits between Father and Gloria. The visits were appropriate, and Gloria responded to Father "like a typical child." Gloria is independent and occasionally does not like to be held or hugged. Tuki also acknowledged that the hair-follicle drug tests revealed that Father continued to use methamphetamine throughout the time the termination case was pending.

Father testified to his love of his daughter and his belief that he had advanced the goal of ceasing to use drugs completely. Father felt that he had done everything possible to avoid future relapses. As to the unsuccessful discharge from the relapse prevention program, Father testified that he became angry because the program delayed his attendance at classes. Father testified that the counselor from the program yelled at him on the phone and that he hung up on her. Father has taken a class on administration of feeding through a G-tube and a Certified Pulmonary Resuscitation (CPR) class. Father emphasized that he had completed the tasks in the service plan twice. Father acknowledged that he agreed to extend the service plan to complete the tasks.

Father had stable employment and housing and the Department had sent a representative to his house three times. When the Department expressed concern about a table that was not sturdy, he disposed of the table immediately. Father testified that he did everything required to create a stable and protective environment

for Gloria.

When asked why he fed his daughter regular food rather than feeding her through the G-tube, Father said he was confused because the Department caseworker had brought food to Gloria. The food caused Gloria to vomit later in the day. When confronted with his action, which caused Gloria distress, Father blamed his action on the caseworker.

At the conclusion of trial, the trial court terminated Father's parental rights on the predicate grounds of endangerment and failure to complete a service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E) & (O).

## II. ANALYSIS

### A. Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*,

96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d at 630; *see In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish, by clear

and convincing evidence, one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B. Predicate Grounds

In two issues, Father argues the evidence is legally and factually insufficient to support termination under Family Code section 161.001(b)(1)(E) and (O). In his third issue, which applies only if we reach the section 161.001(b)(1)(O) challenge, Father argues the evidence established by a preponderance of the evidence that he was unable to complete services under section 161.001(d) of the Texas Family Code. If multiple predicate violations are found by the trial court as a basis for termination, we will affirm on any one violation that is established by clear and convincing evidence. *See In re T.N.F.*, 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied). We will address the trial court's finding of endangerment under subsection E. Because we find that issue dispositive, we need not address Father's challenges to the findings under section O.

Termination of parental rights is warranted if the fact finder finds by clear and convincing evidence, in addition to the best-interest finding, that the parent has, "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). A finding of endangerment under subsection E requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection E

11

must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id*. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a course of conduct. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Among the types of actions or omissions constituting evidence meeting this standard are criminal convictions;[2] drug abuse, and knowledge that a child's parent abused drugs.[3]

This case began with Gloria's very premature birth due to Mother's methamphetamine abuse while pregnant. The Department had to begin conservatorship proceedings immediately because Gloria's parents were unavailable to consent to Gloria's medical treatment. The record reflects that Father tested

---

[2] *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent, may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d at 492. Routinely subjecting a child to the probability that the child will be left alone because the child's parent is in jail endangers the child's physical and emotional well-being. *See Walker v. Tex. Dep't of Human Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533-34.

[3] *In re U.P.*, 105 S.W.3d 222, 234 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (finding evidence legally sufficient to support endangerment when father knew mother abused drugs while pregnant, but failed to report mother to the Department of Family and Protective Services or police).

positive for methamphetamine after Gloria's birth and continued to test positive throughout the pendency of the parental termination proceeding. This court has held that a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing the child, may support a finding to a clear and convincing degree that the parent engaged in conduct that endangered the child's physical or emotional well-being. *See In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *In re A.H.A.*, No. 14-12-00022-CV, 2012 WL 1474414, at *7 (Tex. App.—Houston [14th Dist.] Apr. 26, 2012, no pet.) (mem. op.); *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied).

Father argues that evidence showing that he continued to use drugs while this case was pending is unreliable because the Department did not present expert testimony to explain the "radical swings" in levels of methamphetamine found in Father's hair. Father cites no authority requiring expert testimony to allow a fact finder to infer methamphetamine use based on positive hair follicle drug test results, such as Father's, in parental termination cases. This court has considered this argument before and rejected it. *See In re Z.N.M.*, No. 14-17-00650-CV, 2018 WL 358480, at *6 (Tex. App.—Houston [14th Dist.] Jan. 11, 2018, no pet.) (mem. op.) (rejecting the argument that an expert was necessary to interpret drug testing results); *In re C.M.-L.G.*, No. 14-16-00921-CV, 2017 WL 1719133, at *10 (Tex. App.—Houston [14th Dist.] May 2, 2017, pet. denied) (mem. op.) (same). Each of the drug tests was admitted into evidence and both the caseworker and Child Advocate testified that the tests showed continual use of methamphetamine. A reasonable fact finder could find that an individual repeatedly testing positive for a controlled substance during a period greater than one year did so because that individual continued using drugs during that year. Accordingly, we conclude the trial court

13

reasonably could have relied on the drug test results in terminating Father's parental rights under section 161.001(b)(1)(E) without accompanying expert witness testimony.

The record reflects necessity for the Department's intervention because Gloria was born prematurely to two parents who admitted using methamphetamine. The Department was impeded in trying to place Gloria because Father did not have stable housing and admitted methamphetamine use. After Gloria came under Department conservatorship, Father continued to test positive for methamphetamine, failed to attend Narcotics Anonymous meetings, failed to obtain a Narcotics Anonymous sponsor, and was unsuccessfully discharged from a relapse-prevention program.

Throughout the pendency of this case, Father exhibited unwillingness to admit his addiction and stop methamphetamine use. Father demonstrated no ability to become and remain consistently drug-free for any substantial period of time. A parent's unwillingness to admit addiction to illegal substances suggests the parent will continue to abuse drugs and therefore continue to endanger the child. *In re B.F.*, No. 14-17-00421-CV, 2017 WL 5505821, at *7 (Tex. App.—Houston [14th Dist.] Nov. 16, 2017, no pet.) (mem. op.) (considering evidence that Mother "was in denial about her addiction" harmed her child in the endangerment analysis).

In sum, we conclude the evidence presented with respect to Father's continued methamphetamine use, coupled with his unwillingness to accept responsibility for his addiction, demonstrates a deliberate course of conduct from which a reasonable trier of fact could have found that Father endangered Gloria's emotional and physical well-being. Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Father's parental rights was justified under Family Code section 161.001(b)(1)(E). Further, in view of the entire record, we conclude the disputed

evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(E). Accordingly, we conclude the evidence is factually sufficient to support the 161.001(b)(1)(E) finding.

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection E, we need not review the sufficiency of the evidence to support the subsection O finding. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We overrule Father's first issue and do not reach his second and third issues.

## B. Best Interest of the Child

In Father's fourth issue, he challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of his parental rights is in Gloria's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

The best-interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d at 631. The trier of fact may consider several factors to determine the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in

15

evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with the child's natural parents, and it is the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d at 531. Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72.

### 1.    The desires of the child

Gloria was removed as an infant and is too young to express her desires. When a child is too young to express the child's desires, the fact finder may consider that the child has bonded with the foster parents, is well cared for by the foster parents, and has spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Although Gloria was born with extraordinary medical needs, by the time of trial she was progressing physically in the foster home, beginning to walk and attending ongoing occupational, physical, and speech therapy. Gloria continued to depend on a G-tube for feeding but otherwise was healthy and happy.

Father argues that "it is uncontroverted the child is bonded to both the foster parents and her biological Father." The record reflects that although Gloria never lived with Father, he visited Gloria at every opportunity and Gloria appeared to bond with him. The record also reflects that Gloria is bonded with her foster parents. Although a child's love of a parent is a very important consideration in determining the best interest of the child, it cannot override or outweigh evidence of danger to

16

the child, nor can it compensate for the lack of an opportunity to grow up in a normal and safe way equipped to live a normal, productive, and satisfying life. *See In re K.L.P.*, No. 14-18-00582-CV, 2018 WL 6684275, at *10 (Tex. App.—Houston [14th Dist.] Dec. 20, 2018, pet. denied) (mem. op.).

## 2. Present and future physical and emotional needs of the child and present and future physical and emotional danger

"Regarding this factor, we note that the need for permanence is a paramount consideration for the child's present and future physical and emotional needs." *In re D.R.A.*, 374 S.W.3d at 533. Establishing a stable, permanent home for a child is a compelling government interest. *Id.*

Father argues that he had a stable home and stable income and had taken steps to learn how to care for Gloria's special needs. Additionally, Father argues that "regardless of how [his] drug test was interpreted, there is an undeniable downward trend that indicates improvement," and he was "actively engaged in drug treatment until he had a disagreement with the therapy provider." Despite a "downward trend" in the amount of methamphetamine reflected in Father's hair-follicle test results, the record reflects that Father's drug use continued for more than one year while this case was pending and spiked at one point, indicating relapse. The record further reflects that Father was unsuccessful in a relapse-prevention program and was discharged due to aggression toward staff members of the program. Continued drug use not only may be considered as establishing an endangering course of conduct, but it also may support a finding that termination is in the child's best interest. *In re B.Z.S.*, No. 14-16-00825-CV, 2017 WL 536671, at *5 (Tex. App.—Houston [14th Dist.] Feb. 9, 2017, pet. denied) (mem. op.).

This court and others have found sufficient evidence to support a best-interest finding despite evidence of lifestyle improvements made while a parent's child is

being cared for by others. *See In re A.C.B.*, 198 S.W.3d 294, 299-300 (Tex. App.—Amarillo 2006, no pet.) (notwithstanding post-removal improvement and performance of service plan, prior endangering conduct could support termination); *In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("[E]vidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue"). Father's past behavior and testimony at trial do not indicate that he has engaged in rehabilitation and, if so, that it "will surely continue." *See id.*

### 3. Parental abilities of those seeking custody, stability of the home or proposed placement, and plans for the children by the individuals or agency seeking custody

These related factors compare the Department's plans and proposed placement of the child with the plans and home of the parent seeking to avoid termination of the parent-child relationship. *See In re D.R.A.*, 374 S.W.3d at 535.

Father argues that he has a stable home and is able to care for Gloria. Despite testimony that the foster parents wanted to adopt Gloria, Father points out that they did not testify at trial.

Evidence about placement plans and adoption are, of course, relevant to the child's best interest. *In re C.H.*, 89 S.W.3d at 28. However, the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest regularly would be subject to reversal on the sole ground that an adoptive family has yet to be located. *Id.* Instead, the inquiry is whether, on the entire record, a fact finder reasonably could form a firm conviction or belief that termination of the parent's rights would be in the child's best interest. *Id.*

Accordingly, the lack of testimony from the foster parents does not render the

evidence insufficient to support the trial court's finding that termination of Father's parental rights is in Gloria's best interest. The Department and the foster parents are working to assist Gloria in overcoming the physical challenges caused by her premature birth. The trial court could have determined that keeping Gloria with the foster parents with an eye toward adoption was in her best interest as opposed to placing her with Father.

### 4.    Programs available to assist to promote the best interest of the child

This factor takes into account assistance programs available to the person seeking to avoid termination in promoting the best interest of the child. *See In re D.R.A.*, 374 S.W.3d at 535. Father argues that he sought out additional services to better address Gloria's medical needs. He further notes that no programs were identified that would promote the best interest of the child.

To be sure, Father's extra-curricular attendance at classes to learn about G-tube feeding are commendable. However, the Department required that Father seek help for his addiction, including mandatory attendance at twelve-step meetings and obtaining a Narcotics Anonymous sponsor. The Department also provided a relapse-prevention program and required attendance. In considering this factor the trial court could weigh Father's inability to remain drug free and his lack of success and discharge from the relapse-prevention program due to Father's anger about the program therapist's schedule.

Under all the circumstances in this case and applying the applicable *Holley* factors to all the evidence, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination of Father's parental rights is in Gloria's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We overrule Father's fourth issue.

19

## C. Conservatorship

In his fifth issue Father argues the evidence is legally and factually insufficient to support the trial court's finding that appointment of the Department as sole managing conservator is in the best interest of the child.

We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion and reverse only if we determine the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). When, as here, an appellant challenges the legal and factual sufficiency of the evidence in a case where the proper standard is abuse of discretion, we engage in a two-pronged analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion, and (2) whether the trial court erred in its application of discretion. *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

Texas Family Code section 161.207, entitled "Appointment of Managing Conservator on Termination," provides: "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a). The trial court's appointment of the Department as sole managing conservator may be considered a consequence of termination. *In re I.L.G.*, 531 S.W.3d 346, 357 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Having found the evidence sufficient to support the predicate ground and best-interest finding, we conclude the trial court had sufficient information upon which to exercise its discretion and did not abuse its discretion in appointing the Department as sole managing conservator of the child. *See In re L.G.R.*, 498 S.W.3d at 207 (finding no abuse of discretion in conservatorship finding where the evidence

was sufficient to support termination of parental rights).  We overrule Father's fifth issue.

### III.  CONCLUSION

The evidence is legally and factually sufficient to support the predicate termination finding under subsection E.  And, based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Father's parental rights was in the child's best interest so that she could promptly achieve permanency through adoption.  *See In re M.G.D.*, 108 S.W.3d at 513-14.

We affirm the decree terminating Father's parental rights and naming the Department managing conservator.


/s/       Kevin Jewell
          Justice


Panel consists of Chief Justice Frost and Justices Jewell and Bourliot.